IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CAROL HAINES, | ) | CASE NO.  5:22-CV-01161-SL |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | MAGISTRATE JUDGE |
| ADMINISTRATION, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Plaintiff, Carol Haines, ("Plaintiff" or "Haines"), challenges the final decision of Defendant, Kilolo

Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a

Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth

below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND

REMANDED for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

In November 2017, Haines filed an application for POD and DIB, alleging a disability onset date

of January 15, 2013, and claiming she was disabled due to: deaf left ear; fibromyalgia; POTS; rheumatoid

arthritis; osteoarthritis; brittle bone syndrome; fusion on lower back; fusion on neck; gastroperinesis;

neurogenic bladder; left foot reconstruction; high blood pressure; mitral valve regerge; heart palpitations;

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

night sweats; insomnia; depression; anxiety; and vision impairments. (Transcript ("Tr.") 92-93, 126.)  The application was denied initially and upon reconsideration, and Haines requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 126.)

On August 6, 2019, an ALJ held a hearing, during which Haines, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On October 3, 2019, the ALJ issued a written decision finding Haines was not disabled.  (*Id.* at 126-34.)  On November 18, 2020, the Appeals Council vacated the hearing decision and remanded the case to an ALJ for resolution of several issues.  (*Id.* at 143-45.)

On February 24, 2021, another ALJ held a hearing, during which Haines, represented by counsel, and an impartial VE testified.  (*Id.* at 15.)   On March 10, 2021, the ALJ issued a written decision finding Haines was not disabled.  (*Id.* at 15-25.)  The ALJ's decision became final on April 27, 2022, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On June 30, 2022, Haines filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9-10.)  Haines asserts the following assignment of error:

> (1)    The Administrative Law Judge ("ALJ") committed an error of law and his decision is not supported by substantial evidence because the ALJ failed to provide any explanation of whether Plaintiff's severe fibromyalgia and the resulting symptoms and functional limitations therefrom medically equal the listings at Step Three.

(Doc. No. 7.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Haines was born in December 1964 and was 50 years-old on her date last insured (Tr. 15, 24), making her a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R.

§ 404.1563(d).  She has at least a high school education.  (Tr. 24.)  She has past relevant work as a cosmetologist.  (*Id*. at 23.)

## B.    Relevant Medical Evidence[2]

On June 18, 2012, Haines underwent a right stapedotomy with a 4.25 mm Smart piston prothesis to address progressive right-sided hearing loss.  (Tr. 411-12.)

A bone density evaluation completed on October 22, 2012 revealed osteopenia in the L1-L4 region of the spine.  (*Id*. at 530-31.)  David Brine, M.D., determined Haines was at a medium risk for fracture.  (*Id*. at 531.)

On January 21, 2013, Haines saw Mark Pellegrino, M.D., for her fibromyalgia.  (*Id*. at 1330, 1333.)  Haines reported "fairly constant" back and neck pain that she described as sharp and throbbing and rated as an 8.5/10.  (*Id*. at 1330.)  Haines told Dr. Pellegrino the pain had been getting worse, especially in her neck, shoulders, and back.  (*Id*.)  Haines also complained of worsening foot pain, especially in the arches of her feet.  (*Id*.)  Haines endorsed sweats, sleepiness, sleep problems, headache, local weakness, joint pain and swelling, neck pain, back pain, pain, and stiffness, but denied fever, chills, weight loss or weight gain, numbness, tingling, balance difficulties, spasms, global weakness, myalgia, and focal weakness.  (*Id*.)  On examination, Dr. Pellegrino found normal mobility, tenderness to palpation along the spinous processes, paraspinals, and facet areas in the cervical, thoracic, and lumbar areas, normal range of motion of the spine, normal joint range of motion with no swelling, effusion, or heat, negative straight leg raise test, limited forward flexion, pain in mid-lower hamstrings bilaterally, normal gait, balance, and tandem walking, pain in the lumbar spine, pain in at least 11 of 18 trigger points, and normal strength.  (*Id*. at 1331-32.)  Dr. Pellegrino recommended another set of trigger point injections and IM Ketorolac for

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, as Haines only challenges the ALJ's physical findings, the Court further limits its recitation of the relevant evidence to Haines' physical impairments.

plantar fasciitis and overall fibromyalgia pain.  (*Id.* at 1332.)  Haines underwent injections that day.  (*Id.*)

On February 26, 2013, Haines saw Dr. Pellegrino for follow up.  (*Id.* at 1326.)  Haines rated her neck and back pain as an 8.5/10 and told Dr. Pellegrino the pain had been so intense on occasion that it had a significant impact on her daily activities.  (*Id.*)  Haines reported improvement with the trigger point injections, although she had been having increased pain in the past week.  (*Id.*)  Dr. Pellegrino noted Haines "had excellent benefit from the combination of trigger point injections and IM Ketorolac."  (*Id.*)  Dr. Pellegrino found similar physical findings on examination as he did in January 2013.  (*Id.* at 1327-28.)  As Haines' fibromyalgia had flared up, Dr. Pellegrino recommended another set of injections, which Haines underwent that day.  (*Id.* at 1328.)

On March 19, 2013, Haines saw Carrie Eckhauser, PA-C, for follow up regarding her fibromyalgia.  (*Id.* at 1322, 1325.)  Haines reported increased lower back and neck pain that was radiating to her waist and felt like pelvic cramps.  (*Id.* at 1322.)  Haines also complained of tingling in the right plantar aspect of her foot, right-sided neck pain that caused shaking when Haines tried to write or use fine motor hand skills, and intermittent numbness in the last three digits of her right hand.  (*Id.*)  Haines reported two days of relief from Ketorolac.  (*Id.*)  On examination, Eckhauser found antalgic gait, tenderness to palpation of the trapezius, restricted range of motion of the cervical spine with right rotation, flexion, and extension, positive Spurling's sign on the right, pain of the lumbar spine but normal range of motion, negative straight leg raise test, positive Gillet's, pain to palpation of the lumbosacral junction and into the SI joint on the right, negative Faber's, pain in at least 11 of 18 trigger points, normal strength, and normal coordination.  (*Id.* at 1323-24.)  Eckhauser prescribed a Medrol Dosepak and Duexis, ordered cervical and lumbosacral x-rays, and told Haines to schedule an EMB of the right upper and lower extremities.  (*Id.* at 1325.)  Eckhauser noted this treatment plan was discussed with and approved by Dr. Pellegrino.  (*Id.*)

4

On April 19, 2013, Haines saw Douglas Ehrler, M.D., for back pain for years that radiated down her right leg.  (*Id.* at 594.)  Haines rated her pain as an 8/10.  (*Id.*)  X-rays of the lumbar spine taken that day revealed degenerative disc disease at L5-S1.  (*Id.* at 593.)

On May 16, 2013, Haines underwent a lumbar myelogram, which revealed rudimentary L1 ribs and mild central stenosis.  (*Id.* at 437.)  A lumbar spine CT taken that same day revealed rudimentary ribs bilaterally at L1, small left paramedian disk herniation at L2-L3 with only minimal ventral epidural compression of the thecal sac, degenerative central stenosis, borderline at the L4-L5 intervertebral disk level and mild at the L2-L3 and L3-L4 levels, mild degenerative foraminal stenosis bilaterally at L5-S1, and intervertebral disk and facet degeneration.  (*Id.* at 438-39.)

On June 19, 2013, Haines underwent anterior lumbar interbody fusion of L5-S1, bilateral foraminotomies of L5-S1, and posterior fusion at L5-S1.  (*Id.* at 442.)  Dr. Ehrler discharged Haines on June 21, 2013, without complication.  (*Id.*)

On September 5, 2013, Haines saw Holly Inman, NP, for an ADD checkup.  (*Id.* at 937.)  Haines complained of fatigue, constipation, and nighttime urination, but denied muscle aches due to fibromyalgia, poor balance, and headaches.  (*Id.* at 938.)

On January 22, 2014, Haines saw Kent Ramsey, M.D., for complaints of not hearing well out of her right ear, which had remained unchanged since her surgery.  (*Id.* at 413-14.)  Testing done that day revealed mild hearing loss in the left ear, moderate mixed hearing loss in the right ear, and excellent word recognition bilaterally.  (*Id.* at 414.)  Dr. Ramsey recommended amplification and fluoride supplements, which Haines said she would consider.  (*Id.*)

That same day, Haines saw David Kay, M.D., for complaints of bilateral foot pain and bunions.  (*Id.* at 1128.)  Haines reported she had pain at the ball of her foot at the base of her second and third toe on her right and left feet, and that she had to walk on her heels because of pain.  (*Id.*)  If Haines stepped on

5

the balls of her feet, she had shooting nerve pains.  (*Id.*)  Haines rated her pain as a 6/10.  (*Id.*)  Haines'
diagnoses included Morton's neuroma, claw toe, and bunions.  (*Id.* at 1130.)

On April 11, 2014, Haines went to the hospital for acute back pain that started after bending over,
hearing a snap in her back, and becoming stiff.  (*Id.* at 452.)  Lumbar x-rays revealed prior post-surgical
changes but no other acute osseus abnormality.  (*Id.*)  Treatment providers admitted Haines for pain and
symptom management.  (*Id.*)  Treatment providers noted an inability to ambulate.  (*Id.* at 460.)  On
examination, treatment providers found some back pain in the right lumbosacral areas, which was slightly
tender to palpation, paraspinal muscle spasms, "slightly positive" straight leg raise test on the left, and
limited range of motion with straight leg on the left greater than on the right.  (*Id.* at 461-62.)  Treatment
providers administered analgesics and Flexeril, and Haines' symptoms "gradually" improved.  (*Id.* at 452.)
Once Haines could mobilize without worsening pain and her vitals were stable, she was discharged home
on April 14, 2014.  (*Id.*)

On April 18, 2014, Haines saw Dr. Ehrler for complaints of low back pain.  (*Id.* at 1124.)  Haines
reported doing well after her 2013 lumbar fusion until she bent over to dry her legs off after a shower, felt
a pop, and then had immediate pain that brought her to her knees.  (*Id.*)  Haines told Dr. Ehrler she had
gone to the emergency room where she was admitted for pain management.  (*Id.*)  Treatment providers
discharged Haines with Flexeril, Prednisone, and Vicodin, all of which were helping Haines' pain.  (*Id.*)
Haines reported pain from her buttocks down to her feet bilaterally and rated her pain as a 6/10.  (*Id.*)

On April 24, 2014, Haines underwent modified scarf bunionectomy, Akin bunionectomy, and
second toe proximal phalanx shortening with metacarpophalangeal arthroplasty on the left.  (*Id.* at 1122-
23.)

On May 2, 2014, Haines saw James Sabetta, PAC, for a post-op follow up visit.  (*Id.* at 1117.)
Haines reported doing well, although her foot was still "pretty painful" and she had some tingling and

6

numbness throughout her foot.  (*Id.*)  Sabetta applied gauze dressing to the incision site, wrapped the foot

with ace bandages, and dispensed a toe alignment splint.  (*Id.* at 1121.)

On June 6, 2014, Haines saw Sabetta for another post-op follow up visit.  (*Id.* at 1164.)  Haines

reported she was doing okay, although she was having some pain at the time because it was later in the

day, she had occasional swelling, and she was wearing a boot.  (*Id.*)  Sabetta dispensed a silicone toe

spreader and double budin splint.  (*Id.* at 1168.)  X-rays taken that day revealed a healing left foot.  (*Id.* at

1169.)

On July 23, 2014, Haines saw Sabetta for another post-op follow up visit.  (*Id.* at 1159.)  Haines

reported she had a little bit of pain when walking on her foot and swelling if she was on her foot too long

but denied numbness or tingling.  (*Id.*)  X-rays taken that day revealed satisfactory post-operative

radiographs and progressive healing.  (*Id.* at 1163.)

On October 27, 2014, Haines underwent revision surgery for urge incontinence and InterStim

battery and electrode impedances increased with lead failure.  (*Id.* at 506-07.)

On May 13, 2015, Haines saw Russ Mounts, PAC, for an evaluation of her neck pain.  (*Id.* at

1154.)  Haines reported intermittent neck pain at night that was a 1/10 at its worst and a 0/10 at its best,

and that was associated with numbness and tingling.  (*Id.*)  Haines also complained of limited range of

motion in her shoulder.  (*Id.*)  On examination, Mounts found ambulation without difficulty, balanced and

upright posture, no decompensation, normal prominence, full range of motion of the cervical spine,

although it was painful with right lateral range of motion, full range of motion of the lumbar spine, normal

motor exam, negative special tests, full range of motion of the shoulders, and normal sensation.  (*Id.* at

1156-57.)  X-rays taken that day revealed degenerative disc disease of the cervical spine.  (*Id.* at 1158.)

Mounts diagnosed Haines with radiculitis and degenerative disc disease of the lumbar/sacrum and

prescribed physical therapy.  (*Id.* at 1157.)

7

On May 21, 2015, Haines underwent a physical therapy evaluation for her cervical radiculitis and lumbar/sacrum degenerative disc disease.  (*Id.* at 582.)  Haines reported lumbar fusion surgery two years ago, after which she felt "great" and "wonderful."  (*Id.*)  However, about two months ago, she was falling a lot and thought she may have "'jacked something up'" then.  (*Id.*)  Haines reported her last fall was around Mother's Day.  (*Id.*)  A cervical spine x-ray taken earlier that month showed degeneration in the bottom most levels.  (*Id.*)  Haines complained of neck pain that started six months ago and worsened after her falls, as well as lower back pain that radiated down her left buttock no further than her knee, but denied paresthesias.  (*Id.*)  Haines described her pain as non-stop, throbbing, and uncomfortable, and rated her pain as an 8-9/10 at worst and a 4-5/10 at best.  (*Id.*)  Haines used Naproxen for pain relief, as she could not tolerate narcotics.  (*Id.*)  Haines also complained of coldness and numbness in her right fingers as a result of her neck pain.  (*Id.*)  Haines endorsed pain with bending over to wash hair and keeping her arms elevated to cut hair and reported using her left arm to vacuum and drive, although she was right hand dominant.  (*Id.* at 583.)  Haines rated her pain that day as a 9/10.  (*Id.*)  At the end of testing, Haines reported nausea, right arm pain, and the start of a headache, and rated her pain as a 5/10.  (*Id.* at 585-86.)

On July 10, 2015, Haines saw Dr. Ehrler for continued complaints of "constant and severe neck pain" that radiated from her neck to her right shoulder, down her arm, and into her third and fourth fingers.  (*Id.* at 1186.)  Haines reported associated numbness/tingling and weakness.  (*Id.*)  Sitting, standing, and changing positions aggravated her symptoms.  (*Id.*)  NSAIDs, pain medications, ice, and rest helped her symptoms.  (*Id.*)  Haines reported falling in the past six months as a result of losing balance.  (*Id.*)  On examination, Dr. Ehrler found normal gait, balanced and upright posture, normal motor exam except for 3/5 tricep motor strength and 4/5 wrist flexion on the right, negative special tests, normal sensation, and normal upper extremity reflexes bilaterally.  (*Id.* at 1188-89.)  Dr. Ehrler ordered a cervical

MRI and discussed non-operative and operative treatment with Haines.  (*Id.* at 1189.)  Haines and Dr. Ehrler decided to proceed with non-operative treatment at the time.  (*Id.*)

A CT scan of the cervical spine completed on July 27, 2015 revealed degenerative disk and right uncovertebral joint arthritis at C6-7 and moderate narrowing of the right foramina.  (*Id.* at 522.)

On August 3, 2015, Haines saw Dr. Ehrler for follow up of her neck pain.  (*Id.* at 1193.)  Haines reported having difficulty with jars and denied falling in the past six months.  (*Id.*)  Dr. Ehrler discussed the results of Haines' CT scan, which showed stenosis at C6-7 on the right, with arterial structures better on the right.  (*Id.*)  On examination, Dr. Ehrler found a normal gait, balanced and upright posture, normal motor strength, normal sensation, and normal upper extremity reflexes bilaterally.  (*Id.* at 1195-96.)  Haines and Dr. Ehrler decided to proceed with operative treatment, as Haines' CT scan showed degenerative changes causing cervical stenosis.  (*Id.* at 1196.)

On September 30, 2015, Haines underwent anterior cervical diskectomy, fusion, and allograft bone plating at C6-C7.  (*Id.* at 485.)  Upon admission for surgery, Haines reported her neck pain never improved after her previous back surgery several years ago, and she had attempted injections and chiropractic treatment with no relief.  (*Id.* at 482.)  Haines described her neck pain as constant and that it felt like pressure with a deep, achy pain.  (*Id.*)  Haines stated her neck pain radiated into her right arm.  (*Id.*)  Dr. Ehrler discharged Haines on October 2, 2015, in good condition with good prognosis at the time.  (*Id.* at 486-87.)

On October 12, 2015, Lydia Dennison, PT, discharged Haines from physical therapy after five visits.  (*Id.* at 564-65.)  Dennison noted: "limited treatment complete d/t illness and attendance; treatment was complicated by POTS and the initial treatments mostly focused on pain relief and education in how best to manage POTS to allow for progression of treatment."  (*Id.* at 565.)  The last Dennison spoke to Haines, Haines was undergoing medical management.  (*Id.*)  Dennison noted Haines had been "non-compliant with therapy[,] complicated by POTS, medical testing, illness."  (*Id.*)

9

A bone density evaluation completed on March 31, 2016 revealed osteopenia of the left femur neck, left total femur area, and the L1-L4 region of the spine, and a decrease in bone density since the previous exam.  (*Id.* at 520-21.)  Mark DeGalan, M.D., determined Haines was at a medium risk for fracture.  (*Id.* at 521.)

On May 23, 2017, Haines saw Robert Wilson, M.D., for POTS care and neurological evaluation.  (*Id.* at 834.)  Dr. Wilson noted POTS was diagnosed by tilt table testing three years earlier, and was associated with fatigue, brain fog, shortness of breath with drinking, and reduced stamina.  (*Id.*)  On examination, Dr. Wilson noted normal findings except absent triceps and ankle jerk reflexes, 1/4 biceps, brachioradialis, and knee jerk reflexes, and poor tandem walking.  (*Id.* at 837.)  Dr. Wilson noted a concern for Sjogren's, and that Haines needed basic POTS care.  (*Id.*)  Dr. Wilson ordered additional testing and blood work.  (*Id.*)

On August 10, 2017, Haines underwent syncope-radionuclide hemodynamic testing, which was abnormal.  (*Id.* at 859-62.)

On November 21, 2017, Haines saw Gordon Blackburn, M.D., at the Cleveland Clinic Heart and Vascular Institute as a result of her POTS.  (*Id.* at 823.)  Haines reported chest pain that occurred three times a day, consisted of tight and squeezing chest pressure, and that Haines rated as an 8/10.  (*Id.* at 824.)  Dr. Blackburn noted a stress test that day was normal.  (*Id.* at 825.)  Dr. Blackburn created an individual treatment plan with activity guidelines for Haines and directed her to log her activity until her next appointment in 4-6 weeks for review of her progress, tolerance, and adherence.  (*Id.* at 826.)

On March 21, 2019, Dr. Wilson completed an Autonomic Questionnaire by Treating Physician (POTS) form.  (*Id.* at 1379-81.)  Dr. Wilson stated Haines suffered from dysautonomia.  (*Id.* at 1379.)  Dr. Wilson reported Haines suffered from all 36 listed symptoms.  (*Id.*)  Dr. Wilson opined Haines' symptoms improved with laying down, worsened with alcohol and exercise, changed during the menstrual cycle, and

were related to dizziness or fainting.  (*Id.* at 1380.)  Dr. Wilson reported Haines suffered from depression and her symptoms were related to medication taken by Haines.  (*Id.*)  Dr. Wilson opined Haines' pain was moderate, and she would absent about four or more times a month.  (*Id.* at 1380-81.)

On May 8, 2019, Kristen Keyser, CNP, completed an Off-Task/Absenteeism Questionnaire.  (*Id.* at 1486.)  Keyser opined Haines would be off-task at least 20% of the time as a result of ADD and POTS, neck, lumbar, and lower extremities pain, dizziness with bending and activities on her feet, frequent falls and passing out, and limited trunk and shoulder range of motion.  (*Id.*)  Keyser further opined Haines would be absent four times or more a month.  (*Id.*)  Keyser stated Haines' impairments had existed since at least January 15, 2013.  (*Id.*)

On October 29, 2019, Haines underwent an "[a]pplication of Mayfield headholder, foraminotomy C6-C7 right, fusion C6-C7, instrumentation, allograft bone, and nonstructural."  (*Id.* at 1595.)

On January 26, 2021, Holly Inman, NP, completed a Medical Statement – Physical Abilities and Limitations form.  (*Id.* at 1642.)  Inman opined Haines could work two hours per day, stand 15 minutes at one time and less than 60 minutes in a workday, sit for 30 minutes at one time and 60 minutes in a workday, lift 10 pounds occasionally and five pounds frequently, occasionally bend, stoop, balance, and perform bilateral fine and gross manipulation, frequently reach, occasionally operate a motor vehicle but never work around dangerous equipment, never tolerate heat, cold, dust, smoke or fumes, noise, and heights, and occasionally perform lateral and flexion neck movement.  (*Id.*)  Haines would need to occasionally elevate her legs above waist height in an eight-hour workday.  (*Id.*)  Inman opined that Haines suffered from severe pain and would be absent more than three times a month.  (*Id.*)  Inman stated that these limitations had applied since Haines' first lumbar spine surgery on June 19, 2013.  (*Id.*)

That same day, Inman completed an Off-Task/Absenteeism Questionnaire.  (*Id.* at 1644.)  Inman opined that Haines would be off-task 20% of the day due to limited range of motion secondary to neck and

11

back surgeries, foot surgery, impending left knee replacement, and pain in her left knee, neck, low back, and left foot which varied daily from a 4-10/10.  (*Id.*)  Inman further opined Haines would be absent from work about four times a month and the severity of these limitations had existed since at least January 15, 2013.  (*Id.*)

## C.     State Agency Reports

On February 14, 2018, Rannie Amiri, M.D., reviewed the file and determined Haines had the ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 103, 105.)  Haines had an unlimited ability to push and/or pull, other than shown for lift and/or carry.  (*Id.* at 103.)  Dr. Amiri opined Haines could frequently climb ramps and/or stairs, but never climb ladders, ropes, or scaffolds.  (*Id.* at 103-04.)  Haines could occasionally stoop and crawl and frequently kneel and crouch, and her ability to balance was unlimited.  (*Id.* at 104.)  Haines must avoid concentrated exposure to noise and all exposure to hazards.  (*Id.* at 105.)

On March 31, 2018, on reconsideration, Mehr Siddiqui, M.D., affirmed Dr. Amiri's findings.  (*Id.* at 117-19.)

## D.     Hearing Testimony

During the February 24, 2021 hearing, Haines testified to the following:

- She was not able to drive during the relevant timeframe.  (*Id.* at 73.)  She can do some driving now, but her husband does most of it.  (*Id.*)  Her back pain prevented her from driving back then.  (*Id.*)  Her surgeries did not help much because of the deterioration of her spine.  (*Id.*)

- She was doing hair at the time, but only what she could do.  (*Id.* at 74.)  Her clients were mainly older women she had been working on for over 30 years, so they understood if she had to sit down right away or cancel their appointment.  (*Id.*)  She was working maybe two hours a day even before her back surgery in 2013.  (*Id.*)  She would go in and have to split that time up by taking multiple breaks because she was in so much pain.  (*Id.*)  When she first started working as a cosmetologist she could work on a more full-time basis.  (*Id.* at 74-75.)

- She has difficulty hearing.  (*Id.* at 76.)

- During the relevant timeframe, her pain prevented her from working.  (*Id.* at 77.)  She has fibromyalgia, so she has pain throughout her body, as well as brain fog.  (*Id.*)  She would work on a client and then lay down, and her clients were nice and would wait for her to get back up and try and finish.  (*Id.*)  She had surgery and tried to go back and work through the pain, but she couldn't do it.  (*Id.*)  She worked right next door to her house; it was part of her house.  (*Id.* at 78.)  She had to cancel at least 50% of the time, probably 75% of the time.  (*Id.* at 79.)   She underwent trigger point injections, therapy, and multiple medications for her fibromyalgia, but she could not take the medication.  (*Id.*)

- Her back surgery in 2013 helped with some of the sharp nerve pain that was going into her leg, but it caused sharp pain in her hip when she twisted in another direction.  (*Id.* at 80.)  During the relevant timeframe, she was having pain 24/7.  (*Id.*)  She cannot take pain medicine; she could only take Tylenol, which barely touched her pain, so she wore braces and did anything else until she was able to have something done.  (*Id.*)

- She underwent surgery for her neck pain after trying therapy, injections, and neck braces.  (*Id.* at 81.)  After the surgery, she could turn her head to the right again, but then she had to undergo another neck surgery and she can no longer turn her head to the right.  (*Id.*)  She still has neck pain, and she cannot look up, but she can turn her head from right to left now.  (*Id.*)

- She cannot lift her arms above her shoulders or her hands will go numb, and she frequently will drop her scissors.  (*Id.* at 82.)  It takes her forever to cut someone's hair because she drops her scissors two to three times, and she has to bend over to pick them up, which is difficult for her because of her lower back pain.  (*Id.* at 81-82.)

- She also has POTS, which causes pain, racing heart, brain fog, and difficulty speaking.  (*Id.* at 83.)  She also had bladder issues, which caused frequent urination.  (*Id.* at 83-84.)  She also had arthritis in her feet, which caused fusion of her toes, for which she had to undergo multiple surgeries.  (*Id.* at 84.)  Her foot problems contributed to how long she could be on her feet.  (*Id.* at 84-85.)

- During the relevant timeframe, she could stand for 15-30 minutes before needing to sit down.  (*Id.* at 83.)  She cannot sit for long because her legs go numb, so she would have to stand back up again.  (*Id.*)

The VE testified Haines had past work as a cosmetologist.  (*Id.* at 87.)  The ALJ then posed the following hypothetical question:

> Now, the first hypothetical individual would be at the light exertional range and would have the following additional limitations in that she could never climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs; stoop, kneel,

13

crouch, and crawl.  Now, this individual would be limited to working in an environment with no more than moderate noise intensity as she could frequently reach and handle with the bilateral upper extremities.  She would need to avoid concentrated exposure to extreme cold and vibrations and loud noise and avoid all exposure to hazards such as unprotected heights, moving mechanical parts, any operation of motor vehicles.  This individual could perform simple, routine, and repetitive tasks, but would not be able to perform tasks which require a high production-rate pace such as assembly line work and could respond appropriately to only occasional chance in a routine work setting.  Could that first hypothetical individual perform claimant's past relevant work?

(*Id.* at 88.)

The VE testified the hypothetical individual would not be able to perform Haines' past work as a cosmetologist.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as sales attendant, food service worker, and housekeeper.  (*Id.* at 88-89.)

The ALJ changed the exertional level to sedentary for the second hypothetical.  (*Id.* at 89.)  The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as food and beverage order clerk, charge account clerk, and telephone quotation clerk.  (*Id.*)

In response to a question from the ALJ, the VE testified a person could be off-task an average of 10% of the time and absent no more than once a month to maintain competitive employment.  (*Id.* at 89-90.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

14

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Haines was insured on her alleged disability onset date, January 15, 2013, and remained insured through March 31, 2015, her date last insured ("DLI"). (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Haines must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits.

15

*See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant last met the insured status requirements of the Social Security Act on March 31, 2015.

2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 15, 2013 through her date last insured of March 31, 2015 (20 CFR 404.1571 *et seq.*).

3.     Through the date last insured, the claimant had the following severe impairments: lumbar degenerative disc disease and spinal stenosis with radiculopathy status post fusion, cervical degenerative disc disease and stenosis, carpal tunnel syndrome, Morton's neuroma, conductive hearing loss and otosclerosis, fibromyalgia, and attention deficit disorder (20 CFR 404.1520(c)).

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could never climb ladders, ropes, or scaffolds.  She could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs.  She was limited to work in an environment with no more than moderate noise intensity.  The claimant could frequently reach and handle with the bilateral upper extremities.  She had to avoid concentrated exposure to extreme cold and vibrations, and loud noise.  She had to avoid all exposure to hazards, such as unprotected heights, moving mechanical parts, and the operation of motor vehicles. The claimant could perform simple, routine, and repetitive tasks, but could not perform tasks that required a high production rate pace such as assembly line work and could respond appropriately to occasional changes in a routine work setting.

6.     Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on December **, 1964 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.     The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from January 15, 2013, the alleged onset date, through March 31, 2015, the date last insured (20 CFR 404.1520(g)).

(Tr. 17-25.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different

conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In her sole assignment of error, Haines argues the ALJ erred at Step Three by failing to determine whether her severe impairment of fibromyalgia medically equaled a listing or combined with at least one other medically determinable impairment to medically equal a listing.  (Doc. No. 7 at 16.)  Haines states that the ALJ did not mention fibromyalgia at Step Three, nor consider whether it medically equaled a listing, and the ALJ erred by failing to perform a complete analysis.  (*Id.* at 18.)  Haines notes that the state agency reviewing consultants also did not consider Listing 14.09D (inflammatory arthritis) as part of their analyses.  (*Id.* at n.1.)

In response, the Commissioner asserts that Haines failed to raise any Listing argument at the hearing, and therefore forfeited this argument on judicial review.  (Doc. No. 9 at 1.)  In addition, the ALJ determined Haines "did not have an impairment or combination of impairments that met or medically equaled a listed impairment, a finding that necessarily encompassed the determination that her severe impairment of fibromyalgia did not medically equal a listing."  (*Id.*)  The Commissioner also argues that even if the ALJ erred at Step Three, any such error was harmless because the ALJ's decision proceeded through the remaining steps of the sequential disability analysis.  (*Id.*)

In reply, Haines asserts that "[c]ourts within this District have repeatedly found that the failure to consider whether an individual's fibromyalgia medically equals a relevant listing at Step Three may be reversible error in and of itself."  (Doc. No. 10 at 2) (collecting cases).  Haines argues that, assuming *arguendo* the ALJ's failure to conduct a complete analysis at Step Three was not reversible error, the evidenced summarized in her brief raised a "'substantial question'" over whether Listing 14.09D was equaled, and the ALJ failed to consider fibromyalgia at Step Three.  (*Id.* at 2-3.)  Haines asserts the Commissioner's discussion of the evidence to show Haines' fibromyalgia failed to medically equal a Listing constitutes impermissible *post-hoc* rationale.  (*Id.* at 4-5.)  Regarding forfeiture, Haines maintains

19

the cases cited by the Commissioner are distinguishable from the present case and "the Supreme Court has ruled that the Commissioner's regulations do not require issue exhaustion." (*Id.* at 5.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to

conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision.  *Id.* at 416-17.

Regarding fibromyalgia, it "is not a listed impairment and it cannot meet a listing."  *Rodway v. Comm'r of Soc. Sec.*, Case No. 1:18CV0169, 2019 WL 540871, at *6 (N.D. Ohio Jan. 24, 2019) (collecting cases), *report and recommendation adopted by* 2019 WL 527782 (N.D. Ohio Feb. 11, 2019). "Because fibromyalgia cannot meet a listing at Step Three, the ALJ must determine whether claimant's fibromyalgia medically equals a listing, such as Listing 14.09D for inflammatory arthritis, or whether it combines with at least one other medically determinable impairment to medically equal a listing."  *Id.* at *7 (citing *Kado v. Colvin*, Case No. 1:15-cv-02044-DAP, 2016 WL 6067779 (N.D. Ohio Oct. 17, 2016); *Walker v. Colvin*, Case No. 1:15-CV-1234, 2015 WL 13217098 (N.D. Ohio Dec. 11, 2015)).

Here, at Step Two, the ALJ determined Haines suffered from the severe impairment of fibromyalgia.  (Tr. 17.)  At Step Three, the ALJ determined Haines' impairments did not meet or medically equal the requirements of a Listing, explaining in part as follows:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching such conclusion, I considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(f), 416.927(f)). I considered all relevant listings in reaching this finding, with specific emphasis on listings 1.02, 1.04, 2.10, and 12.11.
>
> With respect to listing 1.02, the claimant had some back and joint dysfunction, but there was no evidence of joint space narrowing, bony destruction, or ankylosis. Moreover, she demonstrated generally normal gait with no need for an ambulatory aid and there was no evidence of substantial problems with fine or gross movements of her upper extremities. As for listing 1.04, the claimant had lumbar and cervical disc degeneration, but there was no nerve root or spinal cord compression or compromise. While she had positive straight leg raising and some strength deficits at one point, such symptoms improved with treatment and she had generally normal reflexes and sensation. She did not have spinal arachnoiditis or lumbar spinal stenosis causing pseudoclaudication. In terms of listing 2.10, the records did not show the air conduction or bone conduction findings described in the listing and she had excellent word recognition.

(*Id.* at 18.)   Nowhere in the Step Three analysis did the ALJ mention Haines' fibromyalgia and discuss whether it medically equaled a listing or combined with at least one other medically determinable impairment to medically equal a listing.   In the remainder of the opinion, the ALJ devotes a single paragraph to a discussion of Haines's fibromyalgia:

> In a January 2013 pain management exam, the claimant reported ongoing pain related to fibromyalgia in her neck, shoulder, back, and feet (14F/9). While she had sixteen positive tender points and spinal tenderness, she had normal joint motion, negative straight leg raising, and normal gait (14F/10). She demonstrated normal muscle strength (14F/11). She had similar exam findings through the spring and she received trigger point injections along with taking Enjuvia and Trazodone (14F/1-6).

(*Id.* at 20-21.)

The undersigned finds this case to be on all fours with this Court's decision in *Rodway*.   As the Court explained in *Rodway*:

> The ALJ determined that claimant's impairments failed to meet Listing 14.09 (Inflammatory Arthritis). *Id.* at 18-19. The ALJ, however, did not analyze whether Rodway's severe impairment of fibromyalgia medically equaled the severity of one of the listed impairments. *Id.* The ALJ should have determined whether claimant's fibromyalgia medically equals a listing, or whether it combines with at least one other medically determinable impairment to medically equal a listing. *Kado*, 2016 WL 6067779, at *7 (citing SSR 12-2p, 2012 WL 3104869 at *6); *Walker*, 2015 WL 13217098, at *6. The ALJ erred by not performing a complete analysis.

> The analysis provided by this court in *Walker* applies equally here:

>> Here, the ALJ did not even mention fibromyalgia or any potentially relevant listing, even after concluding in her Step Two analysis that fibromyalgia was a severe impairment. Application of *Reynolds* and S.S.R. 12-2p to this case results in the conclusion that the ALJ erred in failing to evaluate Plaintiff's fibromyalgia at Step Three. Without any statement from the ALJ addressing Plaintiff's fibromyalgia, the Court is unable to review the ALJ's Step Three finding. Upon remand, the ALJ must provide some analysis regarding whether Plaintiff's fibromyalgia medically equaled a listing or combined with another impairment to equal a listing. *See Cashin v. Colvin*, No. 1:12-CV-909, 2013 WL 3791439, at *5 (N.D. Ohio July 18, 2013) (Report & Recommendation of Limbert, M.J., adopted by Gaughan, J.) (remanding where the ALJ ignored the plaintiff's fibromyalgia at Step Three).

22

*Walker*, 2015 WL 13217098, at *7; *see also Standen*, 2016 WL 915254, at *3-*4 (requiring remand).

The court, however, may consider the decision in its entirety to find support, where the ALJ does not provide meaningful analysis at Step Three to support his conclusion. *Kado*, 2016 WL 6067779, at *9 (citing *Forrest v. Commissioner*, 591 Fed. Appx. 359, 366 (6th Cir. 2014)); *see generally Walker*, 884 F.2d at 245 (court examines all the evidence in the record); *Hubbard*, 2012 WL 883612, at *5 (quoting *Heston*, 245 F.3d at 535). Even after considering the full decision, the court finds no analysis setting forth a medical equivalency determination for fibromyalgia. Although the Commissioner contends that "the ALJ provided an extensive summary of Plaintiff's treatment history," which the Commissioner claims demonstrates that Rodway's fibromyalgia would fail to medically equal a Listing (R. 15, PageID # 1415-1417), the ALJ's decision did not include that analysis or reach that specific conclusion.

The Commissioner also argues that the failure to consider claimant's fibromyalgia at Step Three can be considered harmless error which does not require remand. (R. 15, PageID #: 1413-1414.) This court, however, has found that "failure to evaluate a requisite listing is not 'merely a formalistic matter of procedure,'" and that remand is required. *Standen*, 2016 WL 915254, at *4 (quoting *Reynolds*, 424 Fed.Appx. at 416). The court found this to be so, even in a case where it was not immediately apparent that claimant would meet the listing. *Id.*

The ALJ did not determine whether claimant's severe impairment of fibromyalgia medically equals a listing, or whether it combines with at least one other medically determinable impairment to medically equal a listing. Therefore, the ALJ erred at Step Three, and the case should be remanded for a proper consideration of claimant's fibromyalgia at Step Three.

2019 WL 540871 at **7-8. *See also Kado*, 2016 WL 6067779, at *10 ("The Court finds that the ALJ failed to thoroughly evaluate Kado's fibromyalgia and compare it to the Listing of Impairments as required by Step Three and SSR 12–2p, and a failure to do so is an error. Because the Court cannot discern the reasons for the ALJ's decision regarding fibromyalgia at Step Three, remand is necessary to allow the ALJ to engage in and provide a more thorough Step Three analysis comparing Kado's fibromyalgia to the Listing of Impairments.")

This Court having found that such circumstances warrant remand, the undersigned recommends the Commissioner's decision be vacated and remanded for proper consideration of Haines' fibromyalgia at Step Three.

A word must be said about forfeiture. All cases except for one cited by the Commissioner predate the Supreme Court's decision in *Carr v. Saul*, 141 S.Ct. 1352 (2021).[3] As another court in this circuit recently explained:

> Arguably, the ALJ need not have considered either impairment at any step of the sequential evaluation. Plaintiff did not allege obesity or neuropathy as impairments in his application for benefits, and at his hearing, his attorney denied that Plaintiff had any impairments other than those listed in his application. (ECF No. 9, PageID.69, 106–07, 343, 351.) On these facts alone, many courts would hold that the ALJ here need not have considered either impairment at any step in the sequential evaluation process, reasoning that a claimant waives any argument not made before the ALJ. *See, e.g., Mehay v. Comm'r of Soc. Sec.*, No. 19-cv-12991, 2021 WL 1175285, at *5 (E.D. Mich. Mar. 29, 2021) (citing *Motin v. Comm'r of Soc. Sec.*, No. 09-13354, 2010 WL 1754821, at *3 (E.D. Mich. Apr. 30, 2010)). However, the Supreme Court recently held that social security claimants need not raise Appointments Clause challenges before an ALJ, reasoning that not only are agencies "ill suited to address structural constitutional challenges," but also that generally, issue exhaustion does not apply to non-adversarial administrative proceedings, such as those before the SSA. *Carr v. Saul*, 141 S. Ct. 1352, 1358–61 (2021). Although the Court limited its holding to Appointments Clause challenges, I see no reason why it would not extend to more "routine objections." *Id.* at 1360 n.5. An ALJ must objectively consider a claimant's entire record and may *sua sponte* raise any issue it finds—a claimant should not have to direct the ALJ's attention to evidence that the ALJ must consider anyways. 42 U.S.C. § 423(d)(5)(B); *see* 20 C.F.R. §§ 404.946(b)(1), 404.1520(a)(3). But in any event, the Court need not reach this issue because the ALJ considered the evidence of Plaintiff's obesity and neuropathy.

*Moody v. Comm'r of Soc. Sec.*, Case No. 2:20-cv-13122, 2022 WL 1252403, at *10 n.4 (E.D. Mich. Mar. 17, 2022), *report and recommendation adopted sub nom*, *Moody v. Saul*, 2022 WL 1251010 (E.D. Mich. Apr. 27, 2022). In contrast here, Haines raised her fibromyalgia as one of her claimed reasons for disability and she raised her fibromyalgia at the hearing. In light of the Supreme Court holding that issue exhaustion is not required at the Appeals Council level in *Sims v. Apfel*, 530 U.S. 103 (2000), and in light

---

[3] The sole case that post-dates *Carr*, *Taylor v. Comm'r of Soc. Sec.*, 2022 WL 7828336 (N.D. Ohio Oct. 26, 2022), *report and recommendation adopted by* 2022 WL 17663094 (N.D. Ohio Dec. 14, 2022), is distinguishable as it dealt with polymyositis, not fibromyalgia; fibromyalgia is not a listed impairment and cannot meet a listing, and the ALJ must determine whether a claimant's fibromyalgia medically equals a listing.

of its most recent decision in *Carr*, albeit limited as its holding was to Appointments Clause challenges, the undersigned is skeptical that any issue exhaustion requirement/forfeiture argument would prevail under such circumstances as those presented in this case.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: February 16, 2023                                  *s/ Jonathan Greenberg*
                                                          Jonathan D. Greenberg
                                                          United States Magistrate Judge


## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**